**W. R. GRACE AND COMPANY,**
Plaintiff-Appellee,

v.

**LOCAL UNION NO. 759, INTERNATIONAL UNION OF the UNITED RUBBER, CORK, LINOLEUM AND PLASTIC WORKERS OF AMERICA, Defendant-Appellant.**

No. 80–3661.

United States Court of Appeals,
Fifth Circuit.
Unit A

Aug. 10, 1981.

Rehearing and Rehearing En Banc
Denied Sept. 28, 1981.

---

Cupit & Maxey, Danny E. Cupit, Robert W. Sneed, Jackson, Miss., for defendant-appellant.

Ogletree, Deakins, Nash, Smoak, Stewart & Edwards, Peter G. Nash, Dixie L. Atwater, Washington, D. C., for plaintiff-appellee.

Before CHARLES CLARK, TATE and WILLIAMS, Circuit Judges.

JERRE S. WILLIAMS, Circuit Judge:

This case involves an appeal from a summary judgment granted by the district court setting aside a labor arbitration award in favor of defendant union and enjoining the union from further pursuing similar claims through the grievance procedure. This simple statement of the immediate issue before the Court, however, rests upon an Equal Employment Opportunity Commission determination of racial and sex discrimination, a conciliation agreement with EEOC, an arbitration award prior to the one here challenged, a prior decision of the district court, and a prior decision of this Court. The scene of the development of this industrial relations imbroglio is the plant of the Southbridge Plastics Division of W. R. Grace & Company, in Corinth, Mississippi. At all times involved in the events of this case, defendant union, Local No. 759 of the International Union of United Rubber, Cork, Linoleum and Plastics Workers of America was the certified bargaining representative at the Corinth plant for the employees involved.

In 1972, two black male employees filed a charge against the company with the Equal Employment Opportunity Commission, claiming that the failure to promote them was with racially discriminatory motive. The EEOC made a thorough investigation

of the conditions at the plant. It concluded that there had been racial discrimination as to some employees and remedies were agreed upon. At this point, we drop the issue of racial discrimination entirely from the case.

In its investigation the EEOC also determined that the company had been discriminating against women in its employment practices. Its entire cadre of female employees was clerical, and the EEOC found that there had been discrimination in not giving women opportunity to work in the operating or production phase of the business. As the result of the EEOC investigation, in 1974 the company and the Commission signed a conciliation agreement under which the company agreed to cease its discriminatory practices. A further part of the agreement contained a provision that its terms would override the seniority provisions of the collective bargaining agreement between the parties. The reason underlying this provision of the conciliation agreement, of course, was the conclusion that there having been discrimination in the past, this discrimination would be perpetuated if the company strictly followed contract seniority. Those who had been discriminated against in the past would have lower job and departmental seniority.

While the union knew that such an agreement was being developed, it did not participate in the negotiations. Nor did it sign the agreement or approve it in any way, although it was given the opportunity to do so.

Shortly after the conciliation agreement was signed and the company began to follow it, the union instituted grievance proceedings to establish the seniority rights of male employees who had been laid off while female employees junior to them had been retained in operator positions. The union having insisted that these grievances go to arbitration, the company brought suit in the United States District Court under § 301(a) Labor Management Relations Act, 1947, 29 U.S.C. § 185(a), seeking to enjoin the union from arbitrating grievances where the relief sought in arbitration would conflict with the terms of the conciliation agreement the company had entered into with the EEOC. The EEOC also counterclaimed and crossclaimed against the company and the union seeking a declaratory judgment that the provisions of the conciliation agreement superseded the seniority provisions of the collective bargaining agreement.

In November 1975, the district court held that the conciliation agreement was binding on the company and the union and superseded any conflicting provisions in the labor agreement. It enjoined the arbitrations requested by the union. It rendered a declaratory judgment that the conciliation agreement was binding on all parties to the action and that the seniority provisions of the collective bargaining agreement were in conflict with the conciliation agreement. *Southbridge Plastics Division v. Local No. 759,* 403 F.Supp. 1183 (M.D.Miss.1975). The union appealed to this Court.

While the union's appeal was pending, the United States Supreme Court decided *International Brotherhood of Teamsters v. United States,* 431 U.S. 324, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977). In that case the government had brought suit claiming the employer and the union were engaging in racial discrimination. The government urged the theory, which the EEOC used in this case, that the seniority system in the collective agreement had to yield to the corrective action necessary to eliminate the effects of discriminatory employment practices. The United States Supreme Court found, however, that the seniority systems involved were "bona fide" and, therefore, were specifically protected by § 703(h) of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e–2(h). The Court asserted at p. 350 of its opinion that the legislative history is clear: Title VII was to have no effect on "established seniority rights." Its effect was to be "prospective" only. The Court conceded that a seniority system could tend to perpetuate the effects of discrimination. But the Court held, nevertheless, that the statute protects "bona fide" seniority systems so long as they do not fall within the proviso which prohibits differ-

ences in treatment of employees which are the result of "an intention to discriminate." The Court specifically held: "[T]he union's conduct in agreeing to and maintaining the [seniority] system did not violate Title VII." p. 356. The Court directed the district court to vacate the injunction against the union.

When the appeal of the union in the principal case came on to be heard before this Court, we reversed the district court's decision, relying at least in part upon the Supreme Court's decision in the *Teamsters* case. *Southbridge Plastics Div. v. Local No. 759, Etc.*, 565 F.2d 913 (5th Cir.1978). We also made reference to *Trans World Airlines v. Hardison*, 432 U.S. 63, 97 S.Ct. 2264, 53 L.Ed.2d 113 (1977), which had followed the *Teamsters* case and had held that a discriminatory purpose must be shown before a seniority system can be found not to be bona fide.[1] At p. 916 we said: "[W]holesale destruction of this (seniority) system as authorized by the conciliation agreement cannot be permitted." We concluded by granting the union's counterclaim "seeking arbitration of all grievances arising out of the Company's breach, through its employment of the conciliation agreement, of the seniority provisions contained in the agreement." p. 917.

The company, which had been operating in accordance with the district court's order by following the conciliation agreement rather than the seniority provisions of the collective bargaining agreement, immediately changed its policy in response to the decision of this Court. It began again to follow the bargained seniority plan in the contract.

Our holding, as set out above, had directed arbitration of the grievances filed by the union protesting the company following the conciliation agreement over the seniority provisions of the contract. One such case was submitted to arbitrator Anthony J. Sabella. It involved a male operator who had

been reduced in grade and later laid off while junior female operators were retained. Arbitrator Sabella held in favor of the company. His entire opinion insofar as it states his reasoning for his award is as follows:

> Unquestionably in the period of the violation the Employer was acting in concurrence with the District Court's order, as it was required to do. There is no evidence that the Employer was not acting in good faith in accordance with a legal court order. The Employer could not anticipate nor was it required to anticipate the Circuit's reversal. It would be inequitable and manifestly unfair to penalize the Employer under these circumstances.

The union, however, continued to process grievances involving the same issue. The company went along with the union and submitted some of those grievances to arbitrator Gerald A. Barrett, asserting its claim that the Sabella award involving the same issue was controlling. Arbitrator Barrett upheld the union's grievances. The company then brought this suit to set aside the Barrett award and enjoin pursuit of further similar grievances. § 301 LMRA, 29 U.S.C. § 185(a).

We reverse the district court and render summary judgment for defendant union enforcing the Barrett arbitration award.

## THE POWER OF THE SECOND ARBITRATOR

The precise issue before this Court is whether the second arbitration involving the same factual situation, the Barrett award, should be set aside as invalid. This question, however, turns in large measure on whether the earlier Sabella award which yielded a contrary result was itself valid. In general, it is established that an arbitrator will follow a prior award on controlling facts under the same contract. *Local 103, Int'l U. of Electrical, Radio and Machine*

---

1. The Court also relied upon *Stevenson v. International Paper Co.*, 516 F.2d 103, 118 (5th Cir.1975) (holding the power to enjoin application of a seniority system must be limited to the requirements of Title VII), and *Myers v.*

*Gilman Paper Corp.*, 544 F.2d 837 (5th Cir. 1977), *amended and modified on other grounds*, 556 F.2d 758 (5th Cir.1977) (elaborating on the need for "circumspection" in replacing contract provisions with Title VII requirements).

*Workers, AFL-CIO v. RCA Corp.*, 516 F.2d 1336 (3rd Cir.1975); *Westinghouse Electric*, 45 L.A. 899 (1965); *Sears, Roebuck & Co., Inc.*, 39 L.A. 567 (1962). *But compare Westinghouse Elevator of Puerto Rico v. SIU de Puerto Rico*, 583 F.2d 1184 (1st Cir.1978), reviewing a second arbitration award on the established narrow grounds without regard to the fact that it was contrary to a prior award between the same parties.

Arbitrator Barrett in his award recognized this principle. But it is also established that if an award exceeds the arbitrator's jurisdiction or authority, does not draw its essence from the collective agreement, it cannot be considered to be binding. *Torrington v. Metal Products Workers*, 362 F.2d 677 (2nd Cir.1966) (setting aside such an award). *See also Amalgamated Meat Cutters and Butcher Workmen of North America, Dist. Local No. 540 v. Neuhoff Bros. Packers, Inc.*, 481 F.2d 817 (5th Cir. 1973), recognizing the principle but in the particular case upholding the award. In *San Antonio Newspaper Guild, Local No. 25 v. San Antonio Light Div.*, 481 F.2d 821 (5th Cir.1973), this Court granted enforcement of a second arbitrator's award when the first award was imperfect and inconclusive.

The awards of arbitrators go further. There is a substantial body of jurisprudence reflected in arbitration awards which holds that the second arbitrator need not follow the earlier arbitration if it is found to be "plainly erroneous." For a discussion of this principle see arbitrator Goldberg's opinion in *Mallinckrodt Chemical Works*, 50 L.A. 933, 935 (1968). For other similar arbitration awards see *Carbon Fuel Co.*, 67 L.A. 1038 (1976); *American Smelting & Refining Co.*, 59 L.A. 340 (1972); *Coleman Co., Inc.*, 52 L.A. 357 (1969); *American Cyanimid Co.*, 49 L.A. 314 (1967); *American Steel Foundries*, 19 L.A. 779 (1952).[2]

The contract involved in this case contains what is a typical, but not always included, "finality" clause. Article IV, Section 4, reads:

... The decision of the Arbitrator on the merits of any grievance adjudicated within his jurisdiction and authority as specified in this Agreement shall be final and binding on the aggrieved employee or employees, the Union and the Company.

The existence of this clause in the contract was also relied upon by arbitrator Barrett in taking the view that an award which is within the jurisdiction and authority of the arbitrator should be considered binding in the subsequent arbitration. The role of a finality clause is stressed in the case of *Local 616, Int'l U. of Electrical, Radio and Machine Workers, AFL-CIO v. Byrd Plastics, Inc.*, 428 F.2d 23, 26 (3rd Cir.1970) (a finality clause gives "something similar to res judicata" in the context of labor arbitrations).

It is not necessary in this case to make an authoritative decision as to the extent to which a prior arbitration award should be considered binding upon a subsequent arbitrator when the issue involves the same facts and the same contract provision. We assume that such a prior award is binding, as arbitrator Barrett did assume, if it is within the "jurisdiction and authority" of the arbitrator who makes the award. But there is also no dispute in the law that if the decision of the arbitrator is not "within his jurisdiction and authority" it is invalid. Resolution of the issue raised by the words "jurisdiction and authority" will answer the question of whether the Barrett award can stand in view of the earlier Sabella award.

■ It is from the third case of the well-known "trilogy" of Supreme Court cases in labor arbitration [3] that we find the origin of

---

2. For an even more extreme statement see arbitrator Justin's opinion in *Federal Bearings Co., Inc.*, 22 L.A. 721, 725–6 (1954), "The arbitrator may consider prior awards between the parties ... but he is not bound to follow them." "As long as the arbitrator keeps within his jurisdiction, he can decide the issues submitted to him,

notwithstanding any prior awards between the parties, unless the parties have agreed otherwise."

3. The trilogy consists of *United Steelworkers v. American Mfg. Co.*, 363 U.S. 564, 80 S.Ct. 1343, 4 L.Ed.2d 1403 (1960), and *Steelworkers v.*

the decisive and unwavering authority on this issue. The case is *United Steelworkers v. Enterprise Wheel & Car Corp.*, 363 U.S. 593, 80 S.Ct. 1358, 4 L.Ed.2d 1424 (1960). In contrast to the other two cases of the trilogy, *Enterprise Wheel & Car* involved a suit to enforce an arbitration award rather than a suit to force a recalcitrant party to carry out its promise to arbitrate. The issue in *Enterprise Wheel & Car* was whether the arbitrator had exceeded his jurisdiction in awarding back pay. The Court found that a portion of the arbitrator's award was unclear as to whether or not he had exceeded his jurisdiction. In the following statement, the Court clearly outlined the law which must control the evaluation of arbitrators' awards against the claim that they have moved outside their authority:

> [A]n arbitrator is confined to interpretation and application of the collective bargaining agreement; he does not sit to dispense his own brand of industrial justice. He may of course look for guidance from many sources, yet his award is legitimate only so long as it draws its essence from the collective bargaining agreement. When the arbitrator's words manifest an infidelity to this obligation, courts have no choice but to refuse enforcement of the award. p. 597, 80 S.Ct. at 1361.

A second arbitrator cannot be bound by an arbitration award which violates the obligation outlined in *Enterprise Wheel & Car* since the award is not valid and can be set aside. The finality provision of the contract between the parties in this case makes this principle clear since it provides for finality only if the arbitrator's award is "within his jurisdiction and authority as specified in this Agreement."

Since the issue of the setting aside of the Barrett award turns largely on the issue of whether the arbitrator acted improperly by not considering himself bound by the earlier Sabella award, the core inquiry in this case, as both parties recognize, is whether the Sabella award can stand or was outside his

*Warrior & Gulf Navigation Co.*, 363 U.S. 574, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960), plus the

jurisdiction and authority. Normally the scope of an arbitrator's jurisdiction and authority is wholly dependent upon the agreement of the parties, since they create the tribunal. But in this case there is an added dimension to this requirement, as will be shown later, by virtue of our decision in *Southbridge Plastics.*

## THE TERMS OF THE CONTRACT

The typical collective bargaining contract provides in general that the arbitrator will be used to resolve disputes between the parties as to the meaning, interpretation and application of the provisions of the collective bargaining agreement, *e. g., United Steelworkers v. American Mfg. Co.*, 363 U.S. 564, 565, 80 S.Ct. 1343, 1345, 4 L.Ed.2d 1403 (1960), and it nearly always adds a prohibition against the arbitrator adding to, subtracting from, or modifying the agreement in any way. *See Amalgamated Meat Cutters, Etc. v. Neuhoff, supra* at 819; 2 BNA, Negotiations and Contracts ¶ 51:281.

■ The comparable clause in the collective agreement between these parties, Article IV, Sec. 3, is stronger than the typical clause. It reads:

> The jurisdiction and authority of the Arbitrator of the grievance and his opinion and award shall be confined exclusively to the interpretation and application of the express provision or provisions of this Agreement at issue between the Union and the Company. He shall have no authority to add to, adjust, change, or modify any provision of this Agreement.

This provision shows a stringent requirement by the use of the word "exclusively" and even more by use of the word "express." The second sentence of the provision withdrawing from the arbitrator any "authority" to "add to, adjust, change or modify any provision" of the agreement also is strong and unambiguous. The use of the word "authority" ties immediately into the reference in the next provision in the contract, Article IV, Sec. 4, printed above, which makes an award final and binding

*Enterprise Wheel & Car* case cited and discussed above.

only if it is within the "authority" of the arbitrator.

■ The district court concedes in its opinion that under the "plain terms" of the contract provisions, the Barrett award was correct and should control, absent other considerations. This conclusion is inescapable since arbitrator Sabella did not even refer to the collective bargaining agreement in his award but referred only to the fact that "it would be unequitable and manifestly unfair" to hold against the employer. There is nothing in the contract about the arbitrator balancing the equities or deciding whether something is unfair or not. Literally, the Sabella decision departed from the terms of the collective bargaining agreement.

## THE LAW OF THE CONTRACT

For many years there has been a philosophical and jurisprudential dispute among labor arbitrators as to whether they are entitled to and whether they should look outside the actual wording of the contract to laws which may require the parties to act in ways different from those provided for in the agreement itself. *See* Gorman, Basic Text on Labor Law, p. 543. The discussion, however, becomes unrealistic when the wording of the collective agreement is clearly in conflict with law. It is elementary that a contract provision contrary to law is unenforceable and does not bind the parties. 6A Corbin, Contracts §§ 1373–5; Fairweather, Practice and Procedure in Labor Arbitration, p. 117.

In this case the company relies upon this principle to urge that the law of the contract at the time the grievances arose was the law established by the district court and later reversed by this Court. Within the terms of the contract itself, the company relies upon Article XIV, Section 7, which provides:

> In the event that any provision of this Agreement is found to be in conflict with any State or Federal Laws now existing or hereinafter enacted, it is agreed that such laws shall supersede the conflicting provisions without affecting the remainder of these provisions.

The company contends that the law of the contract at the time these grievances arose was the order of the district court that the conciliation agreement be obeyed—the decision later reversed by this Court. It would follow that if this contention is correct, then the company was complying with the law, and therefore with the law of the contract at the time these grievances arose. This would mean that the Barrett arbitration should be set aside because it did not follow the terms of the contract as effectively modified by the requirements of the law. This would still not necessarily make the Sabella award valid because the Sabella award was not based upon the contract as it applies in the light of the law, but was based solely upon equitable principles and fairness. So under this company theory, the issue becomes whether the Barrett award was within his jurisdiction and authority.

In answering this question the starting point must be that in general the law is now but also has in the past been what the highest tribunal which considers the issue decides is the law. It is in the essential nature of judicial decisions that they normally do not enact law but declare the law which already exists. For example, when one party to a contract declares it rescinded because of a breach by the other party, the first party is running the risk that a court will decide that the other participant in the contract did not engage in a material breach. The rescinding party will find himself liable for damages for an action which he took months before and which he felt was in law a valid action. Of course, other examples abound. Companies may be held liable for triple damages under the antitrust laws for actions taken years before which the companies felt in good faith were legal at that time. A publisher or author of a book may not know it is obscene or libelous until a jury says so one or two years later, at which time the publisher or author becomes liable to a jail sentence or damages for something he in good faith believed was lawful to publish.

One of the clearest examples in the law of the situation where persons may in good faith believe they are acting properly but nevertheless be found to be responsible in damages for improper conduct is in the secondary boycott provisions of the National Labor Relations Act, 29 U.S.C. § 158(b)(4) (unfair labor practice), and 29 U.S.C. § 187 (creating civil liability for exactly the same conduct). It is well established that a NLRB determination not to prosecute a union for violation of § 8(b)(4) is not res judicata and does not bar a suit for damages under § 187 for the same episode. In other words, the union may not only be in good faith before charges are filed that it is not violating the secondary boycott provisions, it may be further convinced by the Board considering its actions but deciding not to prosecute a complaint under § 8(b)(4), but still be found liable for damages under § 187. *Aircraft & Engine Maintenance & Overhaul, Bldg., Const., Mfg., Processing & Distribution & Allied Industries, Emp., Local 290, Intern. Broth. of Teamsters, Chauffeurs, Warehousemen, and Helpers of America v. Oolite Concrete Co.,* 341 F.2d 210 (5th Cir.1965), *cert. denied,* 382 U.S. 972, 86 S.Ct. 529, 15 L.Ed.2d 465 (1966). *Accord, Clark Engineering & Const. Co. v. United Broth. of Carpenters and Joiners of America, Four Rivers Dist. Council,* 510 F.2d 1075 (6th Cir.1975). *See also Painters Dist. Council No. 38, Broth. of Painters, Decorators & Paperhangers of America, AFL-CIO v. Edgewood Contracting Co.,* 416 F.2d 1081, 1085 (5th Cir.1969). These examples of the usual retroactive effect of an appellate court decision reversing a lower court decision or the decision of an administrative agency can be multiplied a thousand fold.

Does this case fall within the usual pattern arising from the reversal of an administrative decision and a lower court decision? As detailed above, the decision of the district court in this case which held that the conciliation agreement superseded the seniority provisions of the collective agreement was reversed on appeal by this Court after the Supreme Court had decided *International Brotherhood of Teamsters v. United States.* In the *Teamsters* case the Court held that the proviso in Title VII of the Civil Rights Act was clear in establishing that the requirements of the Act did not supersede a bona fide seniority system in a collective bargaining agreement. There is no indication in the opinion that the Court was conceiving of itself as changing the law prospectively. It was relying on the wording of the statute as it was passed and giving its interpretation of the law as it had existed from the enactment of the statute. It freed the union from a lower court decision which had held that the union had participated in violating the law by insisting on seniority rights.

The decision involving these parties which followed that Supreme Court decision in this Court, *Southbridge Plastics Div. v. Local No. 759, Etc.,* also declared the law as it had existed throughout. There is nothing in our opinion which indicated that the employer was authorized to have followed the conciliation agreement. Our opinion took its place within the usual and overwhelming pattern of judicial opinions which declare the law as it existed in the past, controlling the actions of the parties. The concluding paragraph of Judge Morgan's opinion in *Southbridge Plastics* reads:

> Finally, having determined that the Company and the EEOC have not shown the seniority system to violate Title VII, that system, as part of a binding agreement between the Company and the Union, must control here. Accordingly, pursuant to that agreement, we grant the Union's counterclaim seeking arbitration of all grievances arising out of the Company's breach, through its employment of the conciliation agreement, of the seniority provisions contained in the agreement. p. 917.

This conclusion makes clear the fact that the Court was declaring the law as it had existed between the parties at the time the company was following the conciliation agreement. The opinion referred unmistakably to the company's action in doing so as a "breach" of the binding contract between the parties. This decision embodied

the typical result of finding a party in breach of contract and therefore vulnerable to the damages occasioned by the breach. There is not the slightest hint of any recognition that the contract provided otherwise before the decision so that the company could be found acting in accordance with its legal obligations when it was following the conciliation agreement. Instead, our opinion found the company was in breach of the contract during this period.

■ Under the promises of the parties in this collective bargaining contract, the damages for breach of contract are to be determined through the arbitration process rather than in court. When the case is seen thus in its proper posture, it is revealed with clarity that the Sabella award exceeded any jurisdiction or authority granted him by the collective agreement. This Court held that the seniority provisions of the agreement were in effect, had been in effect throughout, and had been binding. It further held that the company had breached those provisions. Its referral back to the parties to carry out their promise to arbitrate was far narrower than arbitrator Sabella conceived. He was given no authority to ignore the seniority provisions of the contract and to decide the case on the basis of equity and fairness. His award clearly exceeded his jurisdiction and authority.

In a situation with broad similarities, this Court defined the nature of the action we took in the *Southbridge Plastics* decision. The case is *National Airlines, Inc. v. International Assoc. of Machinists and Aerospace Workers*, 430 F.2d 957 (5th Cir.1970). That case was the second appeal in a dispute arising from the mass discharge by the airline of wildcat strikers while freeze provisions of the Railway Labor Act were in effect. In the first appeal, 416 F.2d 998 (5th Cir.1969), we held the mass discharge of the strikers under the circumstances exceeded the permissible bounds of National's legal authority to engage in self-help. We held that National was entitled only to hire those replacements for the strikers necessary to be able to operate its airline. The case was then remanded to the district court to determine the rights of the strikers as to reinstatement in accordance with this holding.

In the second appeal, we found that the district court had not followed our mandate. The district court had itself assumed the task of defining again the permissible limits of self-help. After hearing more evidence, the district court had determined that no strikers were entitled to reinstatement. Upon the second review, this Court held the earlier holding had withdrawn from the district court the authority to redefine the permissible limits. We had defined those limits in our decision. Instead, the only matters which the district judge was entitled to determine were the details as to which strikers had not been properly replaced and as to the reinstatement of those strikers.

■ Substituting in this case the arbitrator for the trial court in *National Airlines*, which is what the parties had provided for in their contract, this case · is so closely analogous as to be virtually controlled by our earlier decision in *Southbridge Plastics*. In the last paragraph of Judge Morgan's opinion, quoted above, we withdrew from the authority of the arbitrator any right to decide that the employer had not breached the contract and, therefore, was not liable to the employees for having followed the conciliation agreement. It was determined by the specific holding that the employer had breached the contract. Our interpretation of the contract is res judicata and is binding. Arbitrator Sabella's decision is directly contrary to our holding. He specifically found no breach. This Court's binding decision left as the only issues before the arbitrator which employees had been victims of the breach and damages for the breach. Our holding meant the arbitrator was no longer free to decide whether the employer should be liable for a breach or not.

In summary, the wording of the contract itself is restrictive enough to reveal that arbitrator Sabella exceeded his jurisdiction and authority, but also he exceeded the authority defined for him specifically by the

holding of this Court in the *Southbridge Plastics* decision. Further, this same analysis reveals that arbitrator Barrett's decision is correct under the collective bargaining agreement and under our *Southbridge Plastics* mandate. He applied the seniority provisions of the contract, recognized that the employer had breached them, and he awarded damages to the employees who had been injured by the employer's breach. In doing so he properly refused to follow the earlier Sabella award.

■■■ The company urges, however, that the union waived its right to attack the Sabella award by not bringing a suit in court to set it aside. This assertion cannot prevail. The union elected to choose arbitration as the means of setting aside the Sabella award. Under the well established national policy favoring arbitration,[4] this was a proper decision to make. The union had the right to choose this means of attacking the earlier award. As has been pointed out above, there are many instances of second arbitrations being pursued as a means of evaluating the validity of earlier arbitration awards. In *San Antonio Newspaper Guild, Local No. 25 v. San Antonio Light Div., supra*, this Court upheld as binding a second award which resolved issues left so unclear by a first award that we held the first award unenforceable. It is established that if a party to the contract demands a second arbitration to test the validity of the first arbitration, the courts will order the second arbitration because it is for the arbitrator to determine in the first instance whether the prior award is valid. *Local 103, Int'l U. of Electrical, Radio and Machine Workers v. RCA Corp., supra; Avco Local Union No. 787, Int'l U. United Automobile Aerospace & Agricultural Implement Workers of America*, 459 F.2d 968 (3rd Cir.1972).

## A BINDING COURT ORDER?

■■ The conclusion reached immediately above settles the contention of the company that the district judge in the original *Southbridge Plastics* case had issued an order which was binding on the company to apply the conciliation agreement rather than the seniority provision of the collective bargaining agreement. The Court held otherwise by finding the company in breach of contract. But the company contends that it had "no choice" but to obey the order of the district court, even conceding it was voidable on appeal. The company contends that the union should have sought a supersedeas or stay pending the appeal of the decision of the district court which had declared the conciliation agreement applicable (*Southbridge Plastics*). The district judge several times in the case which is before us emphasized in his opinion the fact that the union had not sought a supersedeas.

The impact of this contention must be made clear. The union pursued its remedy by way of appeal to this Court. It did not seek a supersedeas or stay because it followed the district court order pending the appeal. As any law abiding citizen is entitled to do, it bided its time pending its appeal until it could win on appeal.

What the company is urging and what the district judge in this case suggested is that the union should be responsible for obtaining a supersedeas on behalf of and for the benefit of its adversary, the company, so that the company would not be liable in damages if the union won on appeal! Seen in this light, of course, the contention is wholly without merit. The union was not its adversary's keeper. It was pursuing its own lawful remedies in its own way and in no way was defying any decision by the district court.

The company's assertion that it "had no choice" but to obey the order of the district court cannot stand. It did have other choices. It could have appealed. It could have asked for a stay or a supersedeas. It did not do so. Instead it did what many litigants do, it simply predicted the result by obeying the district court and trusting

---

**4.** *United States Steel Corp. v. United Mine Workers*, 519 F.2d 1236, 1242 (5th Cir.1975), *rehearing denied*, 526 F.2d 376 (1976), *cert.* denied, 428 U.S. 910, 96 S.Ct. 3221, 49 L.Ed.2d 1217 (1976).

that the decision of the district court would not be reversed on appeal. To do this was within its rights, but having been wrong about the law of the case, it became obligated to pay for the damage done to the employees because it did obey a court order which could not stand on appeal.

The case which faces us is simply a case of a party relying upon an order of a court under appeal to the detriment of other persons injured by the reliance. Without even seeking to appeal, to obtain a stay or a supersedeas, the company cannot now take the position that it "had no choice" but to obey the court order which was based upon an incorrect interpretation of the law. Further, as mentioned above, this Court's decision reversing the district court in *Southbridge Plastics* in terms forecloses as well the assertion of an obligation to obey the district court order. It finds that the employer breached the contract, and the case was returned for the arbitration of the claims of the particular parties injured by that breach. The contention by the company that it was bound and had no choice but to obey is inconsistent with this Court's conclusion that the company had breached the contract by obeying the order.

## FAIRNESS AND EQUITY

■ Closely related to the issue of the asserted binding effect of the order of the district court in the *Southbridge Plastics* case, is the general assertion upon which the Sabella arbitration award was based and upon which the district judge in this case heavily relied. Arbitrator Sabella and the district judge asserted that it would be unfair, inequitable, and contrary to public policy to require the company to pay for its actions when it was following what it thought to be the law as exemplified in the conciliation agreement. These assertions that it is inequitable to place this burden upon the company are remarkable in that they do not discuss nor even mention the inequity of the deprivation of the employees entitled by the law of the contract each to his status and to the wages which go with that status.

This entire series of events began because the company was violating Title VII of the Civil Rights Act by discriminating on a racial basis and on the basis of gender. There is no question but that the company was in entire good faith in signing the conciliation agreement with the EEOC and following it. But legally it was wrong. It was breaching the collective agreement the company had with the employees. On the other hand the employees' conduct throughout all of these events was impeccably correct. They had not violated Title VII of the statute. They did not agree to the illegal conciliation agreement. Instead, without defying any court order or acting improperly in any way they pursued their legal rights in court. And they won. Yet it is said that the equities favor the employer.

If the company is excused from paying damages for its failure to follow the seniority agreement, its monetary advantage comes directly out of the wages of the workers who are deprived of the back pay to which they are entitled under those seniority provisions. Relieving the company of its obligations would simply be saying that the employees, those who had done nothing wrong and were correct in the law, must bear the financial loss, and those who did violate the law and later followed a course of conduct which, while in good faith, was not authorized in the law are excused from financial responsibility. The injustice, unfairness, and violation of public policy of such a conclusion would indeed be shocking. The equities are on the side of those, the employees and their representative, who have not violated any law, even in good faith, who have pursued their rights in accordance with law throughout this entire proceeding, and whose rights were vindicated in court and in arbitration.

It follows that the district court was in error in granting summary judgment for the company. Instead, a summary judgment enforcing the Barrett arbitration award as requested by the union should have been granted.

REVERSED. Defendant's motion for summary judgment is GRANTED.